CHESAPEAKE & O. R. CO. (RICHARDS v.). See Case No. 11,771.

## Case No. 2,655.

### The CHESHIRE.

[Blatchf. Pr. Cas. 151.][1]

District Court, S. D. New York. May 6, 1862.[2]

#### PRIZE—THE CLAIM—PROOF—TRANSFER OF ENEMY VESSEL—RUNNING BLOCKADE—EVIDENCE.

1. A claim in a prize suit should be one of property merely, and should only put in issue, by a simple denial, the validity of the capture.

2. The papers found on board the captured vessel, and the testimony of the witnesses in preparatorio, can alone be considered on the hearing, in the first instance, in the determination of the issue.

3. A transfer of an enemy vessel by an enemy to a neutral, in an enemy port, during the war, is void.

4. In this case the vessel and cargo were falsely represented to be bona fide neutral property, when they were, in fact, enemy property, and as such liable to capture.

5. A contingent destination to a blockaded port must appear on the ship's papers; otherwise it will be presumed that there was a dishonest purpose in approaching such port.

6. In this case there was positive evidence of such dishonest purpose. The alleged purpose of making inquiry as to the raising of the blockade was a mere pretence.

7. A neutral vessel, with knowledge of the existence of a blockade, has no right to proceed to a blockaded port with the purpose of inquiring there as to the continuance of the blockade.

[Cited in The Empress, Case No. 4,477; Stokely v. Smith, Id. 13,473.]

8. The inquiry must be made elsewhere than at the mouth of the port itself.

9. Vessel and cargo condemned.

BETTS, District Judge. On the 6th of December, 1861, the United States ship-of-war Augusta captured the merchant ship Cheshire, with her cargo, at sea, off the harbor of Savannah, Georgia. The captors sent her to the port of New York for adjudication in this court, as prize of war. A libel was filed on the 23d of December, and, on the 17th of January thereafter, claims were interposed on behalf of Joseph Battersby and William

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Samuel Blatchford, Esq.]

[2] [Affirmed by circuit court in Case No. 2,657; and by supreme court in The Cheshire v. U. S., 3 Wall. (70 U. S.) 231.]

Battersby by Thomas Stone, who represents himself to have been a passenger on board the ship, and her supercargo for the voyage. In these claims it is averred that the Battersbys are British subjects, and partners under the firm of J. & W. Battersby, and the entire cargo was the property of the firm. The test oath to these claims is made by Stone. Various allegations, under the oath of Stone, are annexed to the claims, but they are wholly irrelevant to the issue, except as they may bear upon the question of the credibility of Stone, who was examined as a witness upon the standing interrogatories.

On the 8th of February, following, a further claim was filed, on the part of the Battersbys conjointly, by James Craig, the master of the ship, represented by the same proctor as before, in which it is averred that Joseph Battersby was the sole owner of the vessel, and that Joseph and William, as a mercantile firm, were sole owners of the cargo. To this claim also averments and charges are appended, of tortious and culpable acts on the part of the captors towards the vessel and cargo, and her officers and crew; and to this is added an elaborate instrument, in the form of a protest, reiterating and amplifying the said charges, made in the name of the master, the mate, and three of the crew of the vessel, before the proctor for the claimants, as a notary public.

In the case of The Empress [Case No. 4,476] it has been adjudged in this court that such a mode of pleading in prize causes is irregular and improper; that the claim should be one of property merely, and by a simple denial putting in issue the validity of the capture; and that the papers found on board the captured vessel, and the testimony of the witnesses in preparatorio, can alone be read or considered on the hearing, in the first instance, in the determination of the issue. Such is the well-established rule. The reasons upon which it rests, and the authorities by which it is sustained, are set forth in the case alluded to, and need not be reiterated here. All these collateral statements and protests are, therefore, excluded from the case.

The grounds upon which the validity of the capture is maintained by the libellants are that the alleged neutral ownership of the captured property was simulated, and that the vessel was fitted out at Liverpool, England, and despatched thence on a voyage to Savannah, Georgia, with knowledge, on the part of the owners of vessel and cargo, that the port of Savannah was under blockade at the time, and with the purpose and intent of violating the blockade, which was only prevented by the capture.

On the part of the claimants it is insisted that the vessel and cargo are bona fide neutral property; that the voyage in question was honestly set on foot by them, without the purpose of violating the blockade, and, indeed, without knowledge that it was still in force; and that to avoid misapprehension, the voyage was planned and prosecuted under the precaution and direction that the vessel should sail from Liverpool first to the vicinity of Savannah, there to inquire and ascertain if the port was still under blockade, and if not, to make that her port of destination, and there deliver her cargo; but if the blockade was found to be in force, to go to the British port of Nassau, New Providence. And it is further insisted that these directions were carefully and truly followed and adhered to by the claimants and their agents, and that the vessel was captured by the libellants on their arrival off the port of Savannah, without any warning being indorsed on the ship's register, or any direct previous notice having been given that the port was under blockade.

It will be seen that there are three questions involved in the issue between the parties: 1. Were the vessel and cargo bona fide neutral property, or was the nationality merely simulated as a cover or protection from consequences of capture? 2. Was it truly the purpose of the vessel, on approaching the port of Savannah, to make an honest inquiry into the continuance of a known prior blockade before attempting to enter the port, or was it, on the contrary, designed to attempt to enter without speaking or being bespoken off the harbor, or making any previous effort to ascertain if the blockade were still maintained? 3. With the knowledge of the blockade possessed by the master and the owners of the vessel and cargo, in view of the character of her lading, and on the facts in proof, could she lawfully go to the port of Savannah, to inquire there as to the continued existence of the blockade?

First. As to the neutral ownership of the captured property. The prima facie evidence of this neutrality, as derived either from the ship's papers or from the testimony of the master and the supercargo, on their examination in preparatorio, is open to serious distrust. The vessel was of American build, and had been in the trade between Savannah and Liverpool, conducted, from the time of the breaking out of the rebellion, substantially, if not entirely, by the present claimants, J. & W. Battersby. It is proved that instead of both claimants being residents of Manchester, England, as is averred, one of them was at the commencement of the war, and ever since has been, domiciled in Savannah, and engaged there in conducting the trade of that vessel between that port and Liverpool; and that he being thus domiciliated, and therefore having full knowledge of the state of war between the so-called Confederate States and the United States, of the imposition of the blockade on the port of Savannah, and of its efficiency, the vessel was laden in that port with a cargo, the produce of that country, and actually evaded the blockade of that port and transported her

cargo to Liverpool; that voyage being the one next preceding the voyage upon which she was captured. The American name of the vessel was the Monterey, of Savannah. She was furnished with a British register, under the name of the Cheshire, at Liverpool, on the 30th of August, 1861, about ninety days before her capture; and this constitutes the sole documentary evidence of a change of ownership. No bill of sale is produced, nor is there any evidence of the payment of a consideration for her alleged transfer. Stone, the supercargo, testifies (in answer to the 14th interrogatory) that the vessel was owned by Joseph Battersby. He thinks the bill of sale was given in Savannah by Brigham & Baldwin, or by their agents; and he thinks "it was some time last winter, on the passage from Liverpool to Savannah; they bought her to arrive." "I think this was the way the ship was bought." And, in answer to the 14th interrogatory, he says: "I know Mr. Battersby is the owner by the register, and I have heard him say he was." Brigham & Baldwin, the former registered owners of the ship, were citizens of Savannah, and, as such, were, in law, public enemies at the time of the alleged transfer to Battersby as a British subject. Such a transfer, being in fraud of belligerent rights, could have no validity. Battersby, the alleged transferee, was a partner in the house of trade domiciliated in Savannah, the residence of the other partner. A transfer to him, therefore, of property thus employed in the trade of the enemy would wholly fail in divesting it of its hostile character under the law of nations.

But supposing, for the moment, that such a transfer might have been lawfully made, and that the property might by such transfer have become neutral, yet the reality and integrity of the transfer itself so essentially rest upon the testimony of the witness Stone that his evidence requires special attention. He says that he is an Englishman by birth, but is an American citizen, and has for the last thirteen years resided with his family at Williamsburgh, New York; that he was on board at the time of the capture, which took place nine or ten miles from Tybee, but does not know why the vessel was captured; that she belongs to Joseph Battersby, of Manchester, England; that the master, he thinks, was appointed by Mr. Battersby, in Liverpool, where he took possession of her in October or September last; that the vessel's company when captured consisted of seventeen persons, but he did not belong to the vessel's company, and "had no part, share of, or interest in the vessel or cargo;" and that the vessel sailed from Liverpool to Savannah some time the previous winter with a cargo of salt, and some time in May last back from Savannah to Liverpool with a cargo of cotton, and returned from Liverpool in October, on the voyage upon which she was captured. In answer to the 14th interrogatory, he

says that he knew Battersby was the owner of the vessel from his own declaration and the register, but "does not know who owned the cargo; it was shipped by Charles Hill, of Liverpool;" and he adds, in answer to the 28th interrogatory, that "he supposed the shipper," Charles Hill, "would have owned the cargo when it arrived;" that the Battersbys reside with their families in England, and have always resided there; and that he resides with their family when in England. To the 39th interrogatory, he says that he has "stated all that he knew or believes relative to the true property or destination of vessel and cargo." These formal interrogatories were replied to by the witness, under the solemnity of an oath, on the 17th day of January, 1862. On the same day the claim of the Battersbys is filed, accompanied by the test oath of this witness, who therein swears that "he had been in the employ of the claimants, Joseph Battersby and William Battersby, for upwards of four years, and that he was a passenger on board the ship Cheshire, and supercargo on the voyage on which she was seized, and makes this test oath, and deposes to the verity of the above claim." Thus, by averments of long acquaintance, residence in their families, employment for years, and being supercargo upon this voyage, the witness displays his abundant means of knowledge as to the ownership of the cargo, and states, in the claim, to which he swears, that "all the cargo was owned by the claimants," the Battersbys; while on his examination as a witness by the commissioner, he swears that he "has no knowledge as to the ownership of the cargo," but supposes "that it would, on its arrival, belong to the shipper," Hill.

When it is considered that the good faith of the alleged transfer of the vessel from Brigham & Baldwin rests entirely upon the testimony of this witness, it may well be asked, whether such an irreconcilable incongruity as this in his own sworn statements does not sufficiently impair his credit as a witness, to raise a very serious doubt of the good faith of the alleged transfer?

But the testimony of this witness, Stone, is not only thus impaired by the inconsistencies and contradictions of his own sworn statements upon material points, but upon other points equally material and relating to the questions of the honesty or culpability of the voyage, of the purpose to inquire at the mouth of the port before attempting to enter, and of the design and attempt to enter without inquiry, he is directly contradicted by another witness, examined in preparatorio, who is unimpeached, and who could have no motive or inducement to falsify from position or relationship to the parties, and whose evidence, entirely consistent in itself, and with all the known and conceded facts, is, moreover, confirmed by the vessel's journal or log. This testimony, in connexion with that of Stone, I shall advert to

in considering the next proposition involved in the contestation. I here speak of it as evidence inherently reliable, which directly contradicts that of Stone. When added to this contradiction of himself, it casts such discredit upon his testimony (on which alone rests, the averment of the neutral ownership of the captured property) as, in my judgment, to raise an impressive presumption that the vessel and cargo were falsely represented to be bona fide neutral property, while they, in truth, belonged, wholly or in part, to persons domiciled in the so-called Confederate States, and, therefore, to public enemies of the United States under the law of nations, and were, as such, liable to capture and confiscation. Halleck, Int. Law, c. 21, §§ 1–3; Duer, Ins. lect. 6, §§ 1–3.

Second. Was the voyage of the ship Cheshire from Liverpool to the port of Savannah, and her approach to that port, undertaken and prosecuted with the honest intent to inquire there if the blockade was still in force, and by no means to enter the port without making inquiry; or, on the contrary, was the voyage set on foot and prosecuted, and was the port of Savannah approached, with the purpose and intent to enter without inquiry if a favorable opportunity should occur or could be made?

In entering upon this inquiry, the fact first presenting itself is not without its influence. The business of carrying cotton out of the port of Savannah, and, in return, taking needed supplies to the enemy within that port, in spite of the blockade, seems to have been the business to which the ship was devoted by her owners, and in which she was successfully employed until her capture. But the averment of the purpose, in good faith, to go to the mouth of the port, and there make honest inquiry as to the blockade, and to deliver her cargo there, as her destined port, only in the contingency of finding, on inquiry, that the blockade was raised, is met by an objection which Sir William Scott, in a like case, regards as the most pregnant evidence of the falsity of such representations. The ship's papers disclose no such contingent destination. She was documented simply for a voyage to Nassau or Halifax, and back to a port in Europe. If the averments on which the defence rests be true, then the ship's papers are false, in fraudulently concealing the fact of the contingent destination to Savannah, and representing the destination to be absolute to Nassau or Halifax. The dishonesty of the purpose of the approach to the blockaded port of Savannah is clearly evinced by the studied concealment in the papers of the intent to approach it at all.

In the case to which I have alluded (The Carolina, 3 C. Rob. Adm. 75) Sir William Scott says: "Had there been any fair, contingent, deliberative intention of going to Ostend, that ought to have appeared on the bill of lading, for it ought not to be an absolute destination to Hamburg, if it was at all a question whether the ship might not go to Ostend, a port of the enemy. There is, then, an undue and fraudulent concealment of an important circumstance which ought to have been disclosed." See, also, The Margaretha Charlotte, 3 C. Rob. Adm. 78, note. In a recent case (The Union, 1 Spinks, Prize Cas. 164) Dr. Lushington says that a ship's papers should show her destination to a blockaded port, in the contingency of a blockade being found raised upon her arrival, and otherwise should show her ulterior destination. This offence of clothing a vessel with false documents, which conceal her real destination, and set forth that as her absolute destination which is, in truth, but contingent, is justly regarded as sufficient cause for capture and confiscation.

This vessel, with papers on board which declare that her voyage is from the port of Liverpool to Nassau, New Providence, or to Halifax, Nova Scotia, and which do not disclose any destination as intended in any contingency, is found off the blockaded port of Savannah, in Georgia. Upon authority, the presumption of the dishonest purpose of the voyage, and of the dishonest approach to the blockaded port, arising from the papers, and in the absence of any explanatory proof, is conclusive. And here I might rest the second proposition. But there is positive evidence, in the testimony before me, of the dishonest purpose of the voyage, of such a character that I cannot pass it in silence.

The averred purpose of the approach to Savannah, for inquiry simply, and without design to enter without inquiry, is maintained by the positive testimony of the witness Stone. In reviewing the evidence of this witness upon another point, I have had occasion to show its unworthiness, resulting from its contradictions and inconsistencies, and have alluded to the fact that, upon the point I am now considering, it is in direct conflict with the testimony of a witness whose evidence is consistent in itself, and not only unimpeached, but confirmed by the conceded facts of the case. That witness is John Thornton, one of the crew of the ship, shipped at Liverpool as cook, but who afterwards served as cabin boy. He testifies substantially as follows: that Craig was only the nominal master; that Stone had the actual control on board; that Stone had been long a resident of Savannah, although his family was at Williamsburgh, New York; that Stone informed the witness that he was engaged by Battersby at Savannah, where Battersby lived and carried on business, to take command of the vessel, in Liverpool, for this voyage back to Savannah, with the intention of running the blockade; that the crew were all hired by Stone, who received the vessel from Captain Norton, in September, 1861; that he, Stone, had informed witness that he owned the vessel, and had an interest in the cargo; that this was in New York, and

since the capture; that he heard Stone inform Craig that the vessel ran the blockade on the preceding voyage, when commanded by Captain Norton, under the name of the Monterey, of Savannah; that the cargo, upon this voyage, was to have been delivered in Savannah to Mr. Battersby, who resided there, as did Stone also; that the existence of a blockade was well known to all on board; that on the night before she was captured, the lights of the vessel were all extinguished, and an attempt was made to run the blockade, but that, having failed upon that occasion to find the water sufficiently deep the ship was put about and stood out to sea, till the following morning, when she again stood in for the port, and was captured about seven miles from Tybee; and that Captain Stone said, that if he could have got under the guns of Fort Pulaski he would have been safe; that the cargo cost $30,000, and that, if he had been able to get into the blockaded port, he would have realized $250,000.

No part of the testimony of this witness is inconsistent with the general evidence in the case, other than the conflict between his statements and those of Stone; and as to those differences there would seem to be no doubt, if he is entitled to full credit as to all the declarations and admissions imputed by him to Stone, that his contradictions are so direct and positive to important statements made in Stone's testimony, that the court is bound to withhold belief from the latter.

Thornton is also corroborated, and the averments of Stone are discredited by the ship's log. Stone says that the vessel lay off the port of Savannah two days, and tried to speak three or four vessels, but could not. The log discloses the fact that vessels were present "all around," and states no attempt to speak any of them; nor does it make any allusion to the least difficulty in communicating with either or all of them, had it been desired. The log shows that the Cheshire had been tacking off and on, from early dawn of Thursday, the 5th of December, until the afternoon of Saturday, the 7th, and was actually in a position, at the time testified to by Thornton, to make the attempt to enter the port at night; which attempt Thornton swears was made, and failed for want of sufficient depth of water.

Upon the testimony, and upon all the facts in the case, the conclusion is unavoidable that the ship, with full knowledge of the establishment and efficiency of the blockade of Savannah, was despatched upon a voyage to that port, with a fixed design to violate the blockade and there deliver her cargo, if practicable; and that the alleged purpose of making previous inquiry was a mere pretence, having no real existence. This result is conclusive as to all the alleged rights of the respective claimants, and involves the necessity of condemning both vessel and cargo.

Third. With the knowledge of the blockade possessed by the master and owners of the vessel and cargo, and on the facts in proof could the ship lawfully go to the mouth of the port of Savannah, for the purpose of inquiring there as to the continued existence of the blockade? Although the conclusion to which the evidence has directed me upon the preceding proposition renders it unnecessary to decide this point in the case, yet it is proper to say, whenever the question arises, that it is res adjudicata in this court. In the case of The Delta [Case No. 3,777], not long since argued and determined, the point arose and was decided.

The authorities are clear and conclusive that a neutral vessel, with knowledge of the existence of a blockade, had no right to proceed to the very port blockaded, with the pretended or actual purpose of inquiring there as to its continuance. It is the policy of the law to inhibit neutral vessels from assuming such positions with reference to the blockaded port, as must, of necessity, greatly increase the watchfulness and activity of the naval force, and at the same time afford to the neutral vessel extraordinary facilities for a fraudulent evasion of the rights of a belligerent. It is well settled, that where the destination of a neutral vessel to a blockaded port is contingent upon inquiry, that inquiry must be made elsewhere than at the mouth of the port itself. In the case which I have cited in another connexion (The Union, 1 Spinks. Prize Cas. 164,) Dr. Lushington says, that "where an excuse is set up that the vessel approached the blockaded port to make inquiry, it must be clearly proved by evidence perfectly satisfactory to the judgment of the court that she was ignorant of the fact of the blockade." Here no pretence of ignorance is set up; and, indeed, such pretence, in view of all the facts in proof, and especially of the violation of the blockade on the previous voyage, would be quite preposterous.

In the case of The Delta [supra], I considered, at length, the reasons upon which the rule is placed which prohibits neutral vessels from approaching the blockaded port to make inquiry, and reviewed the authorities which establish the doctrine. As the conclusion in this case is not exclusively or necessarily based upon this doctrine, I need only refer to what was there said, without reiteration. The vessel and cargo, in this case, were, for the several reasons stated, lawfully captured, and a decree of condemnation must be entered accordingly.

This decree was affirmed by the circuit court, on appeal July 17, 1863. [Case No. 2,657.] From the decree of the circuit court the claimants appealed to the supreme court, where the decree was affirmed March 5, 1866. [The Cheshire v. U. S., 3 Wall. (70 U. S.) 231.]